Argued and submitted June 8, affirmed October 27, 2010

# STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

# LUIS SANCHEZ-ALFONSO,
*Defendant-Appellant.*

Washington County Circuit Court
C051693CR; A135246

241 P3d 1194

Bronson D. James, Chief Deputy Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Appellate Division, Office of Public Defense Services. Luis Sanchez-Alfonso filed the supplemental brief *pro se.*

Gregory A. Rios, Assistant Attorney General, argued the cause for respondent. With him on the briefs were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General.

Before Haselton, Presiding Judge, and Brewer, Chief Judge, and Armstrong, Judge.

BREWER, C. J.

**BREWER, C. J.**

Defendant appeals his judgment of conviction for assault in the second degree, assault in the third degree, and two counts of criminal mistreatment. The ultimate issue on appeal is whether, in the circumstances of this case, an expert witness's diagnosis of physical child abuse at the hands of a particular actor—defendant—is admissible scientific evidence. However, on the record before us, we need not answer that question because, even if the answer is "no," the admission of the challenged evidence was harmless. Accordingly, we affirm.

The charges concerned abuse of C, the 18-month-old child of defendant's girlfriend, T. Defendant was residing with T and C. Two other people, J and M, also lived in the home or frequently spent time there. On the night of the charged incident, T became ill and was taken to the hospital by J and M. They left C in the care of defendant. While T was at the hospital, defendant called her, explaining that he had "tripped with [C] and he fell." J went back to the residence to check on C and found that he had a golf-ball-sized lump on his head that had been covered with make-up. The child had a vacant expression, was unresponsive to communication, and would not eat.

J took C to the hospital. The emergency room physician found that C had an injury to the forehead and swelling on the back of the head and around the ear. C also had a contusion on his chin, bruises on his chest and back, and bruises on his right leg. The physician ordered a CAT scan, which showed that C had suffered a fractured skull. Suspecting child abuse, the physician contacted CARES Northwest, a child victim assessment center.

As a result of that contact, C was transferred to a different hospital where a CARES unit was located. A CARES pediatrician, Dr. Skinner, evaluated and treated C. In her evaluation, Skinner reviewed C's emergency room CAT scan results, conducted a physical examination, and gathered statements from C's family and defendant. Based on her review of the CAT scan, Skinner concluded that C had suffered a "parietal occipital" fracture, meaning that the fracture "crossed up and over the midline" and "over the top of

the head and * * * down toward the base." In her opinion, it would have taken "significant force" to cause that type of fracture.

A police officer contacted defendant, who, over a period of multiple interviews, gave the officer two additional and different explanations of how C was injured. First, defendant said that he blacked out while checking on C, and the next thing he remembered was that he was on the floor and C was bleeding. Defendant speculated that perhaps C had fallen off the dresser or that defendant had tripped on toys while holding C. In a later interview, defendant stated that, because he was angry with T, defendant threw C four feet into a dresser and left the room. He returned after a minute to find C on the floor and nonresponsive.

In a written report that she prepared about two weeks after first seeing C, Skinner opined:

> "[Defendant] clearly caused [C's] injuries which caused his hospitalization on May 13. [Defendant] provided at least three versions of what happened to [C] on May 12/May 13. His latest story is that he threw [C] into a dresser; [C] hit the dresser and slid down. Though this may have happened, I do not believe this is the whole story. When I saw [C] on Friday evening, he had approximately 10 areas of injury on his head and neck alone—in addition to a skull fracture. If [C] had only one impact injury (the dresser— then the floor) I would expect one or two areas of his head to be injured; not 10. I believe there were more injuries which took place that night.

> "* * * * *

> "[C] was physically abused by [defendant]. This medical diagnosis is based on [C's] physical exam on Friday May 13, accompanied by review of statements made by [defendant]."

Defendant moved for a hearing under OEC 104 to determine whether Skinner's medical diagnosis was admissible scientific evidence under *State v. O'Key*, 321 Or 285, 306, 899 P2d 663 (1995), and *State v. Brown*, 297 Or 404, 687 P2d 751 (1984). After conducting the requested hearing, the trial court admitted Skinner's written report into evidence over

defendant's objection, and the court allowed her to testify concerning the opinions set out in that report.

Defendant took the stand in his own defense at trial and admitted that he had lied in several versions of his account of the cause of C's injuries. However, he testified that he was not guilty of any of the charged offenses. Defendant disavowed his pretrial statement that he had thrown C against the dresser as a lie that he told at T's request to protect her from legal trouble because she had fallen ill while under the influence of methamphetamine. In closing argument, defendant's attorney summarized defendant's trial testimony about how C's injuries occurred as follows:

"[Defendant] really didn't know much until the next morning when he hears [C] and he's trying to get moving and get out there to find out what's going on with [C] and is listening at the door and then goes in and [C's] laying down and then he's gesturing wanting to be held.

"And [defendant] takes him and picks him up in his arms and, as he turns, he falls and he can't describe exactly how his feet got tangled up, whether it was a box or the toys or the shoes and the way that they'd been put on as he'd come out of the bedroom, but he went down. He went down hard and [C] was below him."

In the state's closing argument, the prosecutor emphasized the quoted portion of Skinner's written report, among other things, quoting her opinion that "[defendant] clearly caused [C's] injuries which caused his hospitalization on May 13." A jury convicted defendant of each of the charged offenses.

On appeal, defendant assigns error to the trial court's admission of the portions of Skinner's report and testimony in which she opined that defendant physically abused C. Defendant reiterates his argument that Skinner's medical diagnosis, identifying defendant as the perpetrator of abuse against C, was not admissible scientific evidence.

Under *O'Key* and *Brown*, "scientific evidence" is admissible if it is relevant under OEC 401, helpful to the trier of fact under OEC 702, and not subject to exclusion under OEC 403. In *State v. Southard*, 347 Or 127, 218 P3d 104 (2009), decided after defendant's trial, the Supreme Court

held that a medical diagnosis of sexual abuse is scientific evidence. The court further held that a statement from an expert that, in the expert's opinion, a child had been sexually abused was inadmissible in the absence of physical evidence of abuse, because it did not tell the jury anything that the jury could not have determined on its own and, therefore, the probative value of any such testimony was outweighed by the danger of unfair prejudicial effect under OEC 403. *Id.* at 142.

■■ In this case, defendant acknowledges that a medical diagnosis of nonaccidental physical abuse that is buttressed by an adequate foundation would constitute admissible scientific evidence. We agree. A medical diagnosis of physical child abuse is "scientific evidence." *See State v. Marrington*, 335 Or 555, 561, 73 P3d 911 (2003) (expert's testimony that "delayed reporting is a predominant feature of disclosure in otherwise verified cases of child sexual abuse" is scientific evidence subject to the analysis set forth in *Brown* and *O'Key*); *see also State v. Perry*, 347 Or 110, 120-21, 218 P3d 95 (2009) (testimony of a witness presenting herself as an expert in her field whose knowledge was based, at least in part, on studies, research, and scientific literature, is scientific evidence and must comply with the standard described in *Brown* and *O'Key* for admission of such evidence). "To be admissible, scientific evidence must meet three criteria: It must be relevant, OEC 401; it must possess sufficient indicia of scientific validity and be helpful to the jury, OEC 702; and its prejudicial effect must not outweigh its probative value, OEC 403." *Southard*, 347 Or at 133.

In *Southard*, the ultimately dispositive question was "whether a diagnosis of 'sexual abuse'—*i.e.*, a statement from an expert that, in the expert's opinion, the child was sexually abused—is admissible in the absence of any physical evidence of abuse." 347 Or at 142. There, a physician at a child abuse assessment center diagnosed the child as having been sexually abused based on the child's statements of abuse and the child's history, gathered from his mother and foster mother, including their reports that he had exhibited sexual behaviors that concerned them. A physical examination revealed no physical evidence of sexual abuse. *Id.* at 131.

The defendant was subsequently charged with two counts of sodomy involving the child. *Id.* Before trial, the defendant moved *in limine* to preclude the state from presenting evidence of the physician's diagnosis of sexual abuse. *Id.* In so moving, the defendant contended that the diagnosis was "scientific evidence" under OEC 702 but did not satisfy the foundational requirements for such evidence. The trial court denied that motion, and, at trial, the physician did, in fact, testify that she had diagnosed the child as having been sexually abused. *Id.* at 132. The jury convicted the defendant and, on appeal, we affirmed the judgment. *Id.* at 129.

On review, the Supreme Court reversed. In doing so, however, the court began by rejecting the defendant's predominant contention that, "without physical evidence of abuse, a diagnosis of child sexual abuse is too unreliable and not sufficiently verifiable to be considered scientifically valid." *Id.* at 132. In rejecting that argument, the court first reiterated the well-established criteria for the admissibility of scientific evidence. Applying those principles, the court then examined the specific methodologies used by the physician and the assessment center in making the diagnosis of sexual abuse and concluded that they possessed "sufficient indicia of scientific validity," even in the absence of physical evidence of abuse, to satisfy the second criteria for admissibility. *Id.* at 137. In sum, "[t]he experts were all qualified, the techniques used are generally accepted, the procedures rely on specialized literature in the field, and the procedures used are not novel. Furthermore, the [assessment center] follows numerous safeguards to enhance objectivity and increase the accuracy of the final diagnosis." *Id.*

The court further determined that the diagnosis of child sexual abuse was relevant, reasoning, "[w]hether sexual abuse has occurred is a material fact in proving a charge of sodomy, and the doctor's diagnosis that the boy had been sexually abused increased the probability of that fact's occurrence." *Id.* at 139. However, the court ultimately concluded that the expert's diagnosis of sexual abuse was nonetheless inadmissible because, under OEC 403, the probative value of that evidence was substantially outweighed by the danger of unfair prejudice. *Id.* at 141. As the court observed, because the doctor's diagnosis "did not tell the jury anything that it

was not equally capable of determining" on its own its probative value was "slight." *Id.* at 140. Conversely, the risk of prejudice was great:

> "The fact that the diagnosis came from a credentialed expert, surrounded with the hallmarks of the scientific method, created a substantial risk that the jury 'may be overly impressed or prejudiced by a perhaps misplaced aura of reliability or validity of the evidence.' "

*Id.* at 140-41 (*quoting Brown*, 297 Or at 439). Moreover, because the diagnosis was based primarily on the doctor's assessment of the child's credibility, it "pose[s] the risk that the jury will not make its own credibility determination, which it is fully capable of doing, but will instead defer to the expert's implicit conclusion that the victim's reports of abuse are credible." *Id.* at 141. In those circumstances, "the risk that the jury will defer to the expert's assessment outweighs whatever probative value the diagnosis may have." *Id.* at 142.

In light of *Southard*, we agree with the state that Skinner's medical diagnosis that C was a victim of physical child abuse was scientifically valid. As a medically trained pediatrician specializing in the field of child abuse treatment for 14 years, Skinner was qualified. In addition, she testified that the diagnosis and treatment of child abuse was generally accepted in the medical field, explaining that there had been "an explosion" in the area of child abuse treatment "since the seventies" involving an emergence of literature, studies, and training. She explained that professional literature existed on the clinical study of child abuse, including at least one journal exclusively devoted to the subject. Skinner also testified how her diagnostic approach involved both subjective and objective analysis. She considers objective factors such as physical examination, laboratory and radiologic test results, and social history to rule in and out potential causes for a subject's injuries. According to Skinner, that diagnostic approach was amenable to peer review, because another professional could use the same techniques to arrive at the same conclusion. In short, much like the diagnosis of sexual abuse that the court held was scientifically valid in *Southard*, the diagnosis of physical child abuse in this case—involving a

comparable scientific methodology that included the gathering of social history—was scientifically valid.

However, as defendant observes, Skinner and the state both claimed more for Skinner's diagnosis, which included an opinion that defendant was the perpetrator of the abuse. Some courts have held that an expert's identification of the defendant as the perpetrator of abuse is not valid scientific evidence. *See, e.g., State v. Alberico,* 116 NM 156, 861 P2d 192, 211 (1993) (holding that, in addition to prohibiting expert testimony as to the alleged victim's credibility, a psychologist may not testify as to the identity of the alleged perpetrator of the crime because, although a psychologist can independently evaluate the victim's allegations of sexual abuse by cross-checking her symptoms with those recognized in DSM III-R, there appears to be no similar verification for identifying the alleged abuser). However, the state remonstrates that that rule does not prohibit an expert witness from opining as to whether a defendant's version of events is consistent with the physical evidence that the expert has evaluated for purposes of rendering an opinion. As the state observes, here, there was ample physical evidence that C had been abused. In addition, Skinner testified that statements made by the person in charge of a child who is injured are an important part of the history that informs a diagnosis of physical child abuse. Although Skinner's testimony identified defendant as the perpetrator of physical abuse, the state notes that her opinion was based on the plausibility of defendant's own statements—including what turned out to be his theory of defense at trial—concerning how C's injuries were caused in light of that physical evidence. So understood, the state urges, the challenged evidence was valid scientific evidence, because it involved the application of accepted scientific techniques to evaluate defendant's theory of the case.

We need not determine whether the challenged evidence was admissible in this case, because any error in admitting it was harmless. Under Article VII (Amended), section 3, of the Oregon Constitution an appellate court must "affirm a conviction, notwithstanding any evidentiary error, if there is little likelihood that the error affected the verdict." *State v. Gibson,* 338 Or 560, 576, 113 P3d 423, *cert den,* 546 US 1044 (2005). The court's inquiry

"must focus on the possible influence of the error on the verdict rendered, not whether this court, sitting as a factfinder, would regard the evidence of guilt as substantial and compelling. That inquiry requires us to examine the nature of the error that occurred below and the context of that error. If the particular issue to which the error pertains has no relationship to the jury's determination of its verdict, then there is little likelihood that the error affected the verdict."

*Id.* (internal quotation marks and citations omitted). "The foregoing statement of the law does not purport to establish a separate or different inquiry when the evidence in question is, as it is in this case, scientific evidence. The test is equally applicable whether the evidence in question is scientific or ordinary." *State v. Willis*, 348 Or 566, 572 n 2, 236 P3d 714 (2010).

The state asserts that any error in admitting the challenged evidence in this case was harmless because

"[h]ere the prosecution's case was strong and, in the context of the state's case, the child-abuse diagnosis was relatively unimportant. The state's theory of defendant's culpability primarily focused on defendant's wildly differing accounts of how the victim was injured. * * * The prosecutor's discussion of Dr. Skinner's child-abuse diagnosis in his closing argument was limited to one and a half pages in the transcript. In sum, the child-abuse diagnosis was of minor significance to the state's theory of the case."

The state also asserts that any error was harmless because the challenged evidence was cumulative of other persuasive evidence that defendant caused C's injuries. The state points to defendant's admission that he threw the child against a dresser, and his multiple, conflicting, explanations of how C was injured while in his care.

We agree that the error, if any, was harmless. In reaching that conclusion, we consider the asserted error in context. Defendant took the stand in his own defense at trial and admitted that he had lied in several versions of his account of the cause of C's injuries. Defendant disavowed his pretrial statement that he had thrown C against the dresser as a lie that he told at T's request to protect her from legal trouble because she had fallen ill while under the influence of

methamphetamine. In closing argument, defendant's attorney summarized defendant's trial testimony about how C's injuries occurred as follows:

> "[Defendant] really didn't know much until the next morning when he hears [C] and he's trying to get moving and get out there to find out what's going on with [C] and is listening at the door and then goes in and [C's] laying down and then he's gesturing wanting to be held.
>
> "And [defendant] takes him and picks him up in his arms and, as he turns, he falls and he can't describe exactly how his feet got tangled up, whether it was a box or the toys or the shoes and the way that they'd been put on as he'd come out of the bedroom, but he went down. He went down hard and [C] was below him."

Although defendant's counsel also argued that J was not a credible witness and that J might have injured C on another occasion, defendant never posited that anyone other than defendant himself caused the physical injuries that C suffered on or about May 13, 2005, that is, the physical injuries at issue in the indictment in this case.

In determining the possible influence of the error on the jury's verdict, we consider whether the erroneously admitted evidence went to "the heart of * * * the case." *State v. Davis*, 336 Or 19, 34, 77 P3d 1111 (2003) (using that description to explain why certain evidentiary error is not harmless). At the heart of this case was the parties' disagreement about defendant's mental state when he injured C on the date in question. In contrast, the challenged evidence went to a part of the case that was not meaningfully at issue, namely, defendant's role as the causal agent of those injuries. In that regard, this case is distinguishable from *Willis*, where the Supreme Court held that a trial court's error in admitting a scientific report authored by a state police criminalist that identified a particular substance seized from defendant as methamphetamine, where the criminalist was not present to testify, was not harmless. The court stated:

> "In light of the other evidence in this case, a chemical analysis was necessary to establish the identity of the substance in the vial in a persuasive way, which presumably is why the state offered the laboratory report. Science either

can turn suspicion into probability, or it can establish that the substance was not the specific controlled substance alleged in the indictment (or, indeed, was not a controlled substance of any kind). Any juror would wish to have the scientific answer, and could be expected to give it weight. Far from being able to say, on this record, that there was 'little likelihood' that any error in admitting the laboratory report 'affected the verdict,' we conclude that there was a high likelihood that the improperly received report *did* affect the verdict. The error was not harmless."

*Willis*, 348 Or at 573 (emphasis in original).

Here, the state's evidence on the central issue of whether C was physically abused was very strong, defendant's theory of the case on that issue was inherently problematic, and Skinner's opinion refuted that theory in a forceful way. However, the portion of her report and testimony that defendant challenges on appeal did not go to the heart of any disputed issue in the case. We conclude that there is little likelihood that its admission affected the jury's verdict, and the error—if any—in admitting it, was harmless.

Affirmed.