Submitted May 27, 2014, affirmed February 4, petition for review denied July 9, 2015 (357 Or 551)

**STATE OF OREGON,**
*Plaintiff-Respondent,*

*v.*

**GEORGE WOODY REED,**
*Defendant-Appellant.*

Crook County Circuit Court
12FE0008; A151558

343 P3d 680

Peter Gartlan, Chief Defender, and Mary M. Reese, Senior Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Rolf C. Moan, Assistant Attorney General, filed the brief for respondent.

Before Sercombe, Presiding Judge, and Hadlock, Judge, and Mooney, Judge pro tempore.

SERCOMBE, P. J.

**SERCOMBE, P. J.**

Following a jury trial, defendant was convicted of one count of first-degree rape, ORS 163.375,[1] two counts of first-degree sexual abuse, ORS 163.427,[2] and one count of incest, ORS 163.525. He appeals from the resulting judgment, raising three assignments of error. We reject without discussion defendant's second and third assignments of error, and write only to address his first assignment in which he asserts that the trial court erred in admitting expert testimony concerning the victim's ability to consent. As explained below, we reject defendant's contention and, therefore, affirm.

We state the background facts necessary to provide context for the evidence at issue on appeal. The victim in this case is defendant's adult daughter who suffers from cerebral palsy and severe intellectual disabilities. The victim cannot speak, read, use sign language, walk unassisted, or use a toilet, nor can she feed, groom, dress, or bathe herself. Defendant was the victim's primary caretaker and, as part of that caretaking, bathed the victim and changed her diapers. On more than one occasion over a number of months, defendant had sexual intercourse with the victim.

After it became apparent to him that the victim was pregnant, defendant told his wife that he had engaged

---

[1] ORS 163.375(1) provides:

"A person who has sexual intercourse with another person commits the crime of rape in the first degree if:

"(a) The victim is subjected to forcible compulsion by the person;

"(b) The victim is under 12 years of age;

"(c) The victim is under 16 years of age and is the person's sibling, of whole or half blood, the person's child or the person's spouse's child; or

"(d) The victim is incapable of consent by reason of mental defect, mental incapacitation or physical helplessness."

[2] Under ORS 163.427(1),

"[a] person commits the crime of sexual abuse in the first degree when that person:

"(a) Subjects another person to sexual contact and:

"(A) The victim is less than 14 years of age;

"(B) The victim is subjected to forcible compulsion by the actor; or

"(C) The victim is incapable of consent by reason of being mentally defective, mentally incapacitated or physically helpless[.]"

in sexual contact with the victim. Defendant's wife reported the conduct to the police and, during a subsequent interview with officers, defendant admitted to having engaged in sexual conduct with the victim on more than one occasion. Defendant was charged with two counts of first-degree rape, two counts of first-degree sexual abuse, and two counts of incest. One of the rape counts was based on the allegation that the victim was incapable of consenting to sexual intercourse by reason of mental defect and the other was based on the allegation that the victim was incapable of consent because of physical helplessness. Similarly, one sexual abuse count alleged that the victim had a mental defect and the other alleged that she was physically helpless.

At trial, it was undisputed that defendant had engaged in sexual conduct with the victim and that she had become pregnant as a result. However, based on the allegations in the indictment, the state was required to prove that the victim was incapable of consent by reason of mental defect or physical helplessness. For the purposes of first-degree rape and sexual abuse, the term "'[m]entally defective' means that a person suffers from a mental disease or defect that renders the person incapable of appraising the nature of the conduct of the person." ORS 163.305(3). "ORS 163.305(3) refers to a mental defect that prevents one from appraising the nature of one's own conduct. The 'appraisal' must constitute an exercise of judgment and the making of choices based on an understanding of the nature of one's own conduct." *State v. Reed*, 339 Or 239, 244, 118 P3d 791 (2005). "'Physically helpless' means that a person is unconscious or for any other reason is physically unable to communicate unwillingness to an act." ORS 163.305(5).

Although she could not testify, the state presented a video of the victim. In addition, among other things, the state presented expert testimony from a clinical psychologist, Dr. Elena Balduzzi, that the victim was not competent to consent to sexual activity. After defendant objected to Balduzzi's conclusions, asserting that the testimony was "lacking any foundation in scientific evidence," the court

held a hearing to determine whether the evidence met the standards articulated in *State v. Brown*, 297 Or 404, 687 P2d 751 (1984), and *State v. O'Key*, 321 Or 285, 899 P2d 663 (1995), for the admission of scientific evidence under OEC 702 and OEC 401.[3] At the hearing, the court heard evidence—set forth in detail later in this opinion—relating to Balduzzi's assessment of the victim and, in particular, her use of the "Sexual Consent and Education Assessment" (SCEA).

The court concluded that the evidence was relevant under OEC 401, and helpful to the jury under OEC 702. In particular, the court evaluated the scientific validity of the evidence under the factors set forth in *Brown* and *O'Key*.[4] The court concluded that the evidence was relevant under OEC 401 and that it was scientifically valid and admissible. Accordingly, the court denied defendant's motion to exclude Balduzzi's testimony that, based on her assessment using the SCEA protocol, the victim was incapable of consenting to sexual conduct. The jury ultimately convicted defendant of one count of first-degree rape (based on inability to consent by reason of physical helplessness), two counts of

---

[3] Under OEC 401, to be relevant, evidence must have a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

OEC 702 provides:

"If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

[4] As discussed below, read together, *Brown* and *O'Key* identify factors to be considered when determining the validity of scientific evidence, although the factors are "not an exclusive list of considerations to be applied mechanically." *State v. Sampson*, 167 Or App 489, 500, 6 P3d 543, *rev den*, 331 Or 361 (2000). Those are:

"(1) The technique's general acceptance in the field;

"(2) The expert's qualifications and stature;

"(3) The use which has been made of the technique;

"(4) The potential rate of error;

"(5) The existence of specialized literature;

"(6) The novelty of the invention; and

"(7) The extent to which the technique relies on the subjective interpretation of the expert."

*O'Key*, 321 Or at 299 (internal quotation marks omitted).

first-degree sexual abuse (based on inability to consent, one by reason of mental defect and the other by reason of physical helplessness), and one count of incest.[5]

Defendant challenges the rape and sexual abuse convictions on appeal, asserting that the "trial court erred in admitting Balduzzi's opinion that [the victim] was not competent to consent to sexual activity and her related testimony sustaining that opinion." In defendant's view, Balduzzi's opinion based on the SCEA did not possess sufficient indicia of scientific reliability and, therefore, was not admissible. The state "agrees with defendant that the testimony was 'scientific' evidence and thus had to satisfy the standards articulated in *State v. Brown*, * * * and *State v. O'Key*" for admitting scientific evidence under OEC 702 and OEC 401. It contends that it "demonstrated that Dr. Balduzzi's testimony about the SCEA, and about its application to the victim was—in *O'Key*'s words, and in light of its seven-factor test—'based on scientifically valid principles and * * * pertinent to the issue to which it is directed.'" (Ellipses in original.) Thus, according to the state, "the trial court correctly deemed Dr. Balduzzi's testimony to be admissible scientific evidence."

Because the "validity of scientific evidence presents a legal question, we review the [trial] court's ruling on the admissibility of such evidence for legal error." *State v. Branch*, 243 Or App 309, 314, 259 P3d 103, *rev den*, 351 Or 216 (2011).

The proponent of "scientific" evidence must demonstrate that "the proposed evidence is based on scientifically valid principles and is pertinent to the issue to which it is directed." *O'Key*, 321 Or at 303. "Under *Brown* and *O'Key*, scientific evidence is admissible if it is relevant under OEC 401, helpful to the trier of fact under OEC 702, and not subject to exclusion under OEC 403." *State v. Perry*, 347 Or 110, 121, 218 P3d 95 (2009) (footnotes omitted). To evaluate the relevance and helpfulness of scientific evidence, courts consider a number of factors:

---

[5] Defendant was acquitted of one count of first-degree rape and one count of incest.

"'(1)  The technique's general acceptance in the field;

"'(2)  The expert's qualification and stature;

"'(3)  The use which has been made of the technique;

"'(4)  The potential rate of error;

"'(5)  The existence of specialized literature;

"'(6)  The novelty of the invention; and

"'(7)  The extent to which the technique relies on the subjective interpretation of the expert.'"

*State v. Sampson*, 167 Or App 489, 500, 6 P3d 543, *rev den*, 331 Or 361 (2000) (footnotes omitted) (quoting *O'Key*, 321 Or at 299). "In considering the question of scientific validity *** , courts must bear in mind the foregoing factors are not exclusive and are not to be used as a mechanical checklist requiring an affirmative finding with respect to each factor." *Perry*, 347 Or at 122; *see also Brown*, 297 Or at 417-18 ("The existence or nonexistence of these factors may all enter into the court's final decision on admissibility of the novel scientific evidence, but need not necessarily do so. What is important is not lockstep affirmative findings as to each factor, but analysis of each factor by the court in reaching its decision on the probative value of the evidence under OEC 401 and OEC 702."). "Underpinning the entire admissibility analysis *** is the requirement that the evidence be shown to be scientifically valid." *Perry*, 347 Or at 121; *see also O'Key*, 321 Or at 305 ("[T]he overarching subject of this multifactor, flexible inquiry is the scientific validity—and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission[.]" (Internal quotation marks omitted.)); *Brown*, 297 Or at 417 (factors "provide structure and guidance" in an assessment of scientific validity, but are not a checklist).

With those standards in mind, we turn to the evidence relating to the use of the SCEA in this case. Balduzzi has a doctorate in clinical psychology and has been licensed in Oregon since 2006. Before 2009, when she entered private practice, Balduzzi worked at the Oregon State Hospital with developmentally disabled adult males and men found

guilty but insane. In private practice, she conducts psychosexual evaluations on sex offenders, does prerelease evaluations on inmates, and has a contract with the Department of Human Services (DHS) pursuant to which she conducts evaluations of competence to consent to sexual activity. As part of her education, Balduzzi took courses relating to that assessment. In addition, with relation to the specific assessment of competence to consent to sexual activity, she has conducted an extensive literature review to further educate herself in that particular area.

To conduct an evaluation of competence to consent, Balduzzi conducts a clinical interview of the person and, in that interview, assesses the person using the SCEA—a tool "designed to assess competence to consent to sexual activity." As part of that assessment, she also interviews collateral sources such as care providers or others who have had an opportunity to observe the person over an extended period of time and reviews records related to the person, such as police reports and documentation from care providers.

The SCEA is a structured questionnaire that was developed by a doctor of neuropsychology. The tool was developed with the input of more than 300 doctoral level psychology practitioners with specialties in neuropsychology, developmental disability, brain trauma, and sexuality. The contributions of those specialists were subjected to statistical analysis and from that were taken the items that the majority of specialists agreed were "essential to the notion of competence to consent." That provides the basis for the SCEA protocol. The SCEA has two components that it assesses—knowledge (the K-scale) and skills relating to self-protection (the S-scale). The general technique used in the SCEA—interviewing the person evaluated, as well as interviewing collateral sources and reviewing documentation relating to the person evaluated—is generally used in psychological evaluations. However, the items assessed are specifically directed to a person's competence to consent to sexual activity. The questions in the K-scale assess whether the person being evaluated has basic and essential knowledge relating to sex: the difference between males and females in terms of their sexual organs, the purpose of

the sexual organs, what sex is. The K-scale also includes questions that evaluate whether the person understands the potential consequences of sexual activity, such as pregnancy and sexually transmitted diseases.

With respect to the S-scale, to be considered competent, a person must be able to communicate "no," recognize dangerous situations, make choices based on preferences, plan future actions, and understand that things have logical consequences. In assessing whether an intellectually disabled person has those self-protection skills, an evaluator using the SCEA interviews individuals who observe the person on a daily basis to determine how he or she functions in those areas. The SCEA comes with a lengthy protocol and safeguards, it provides examples, sample responses, and specifies how and when an evaluator should prompt for more information to provide a person being examined ample opportunity to demonstrate their knowledge. If a person does not pass either of the areas evaluated, he or she is not considered competent to consent to sexual activity.

The SCEA is not commercially available, and Balduzzi obtained it directly from the tool's author. Balduzzi also discussed the tool's use with the author, who has continued to make herself available to Balduzzi for consultation. There has been literature published and peer reviewed about the SCEA. In particular, the author of the tool published extensively regarding its development. There was a peer reviewed publication relating to the SCEA in 1993. According to Balduzzi, the SCEA has "been subjected to peer review," and has "been field tested for the purposes of establishing its reliability and validity." In 1999, a research study assessing the tool's reliability and validity was published in a peer-reviewed journal. That study examined the SCEA's application to a number of cognitively impaired adults and, in the study, "internal consistency reliability was measured using statistical analysis, and found to be .89 for the K-scale, and .7 for the S-scale, which are both considered to be high internal consistency reliability." In addition, in the same study, interrater "reliability was also calculated"—that is, the "degree to which separate raters agree in their scoring of the tool." Statistical analysis resulted in a "finding of .96 for the K-scale, and .92

for the S-scale." The article concluded that interrater "reliability for the overall competency determination" using the SCEA "was 1.0" which equals a "[p]erfect score." Thus, the results indicated that the SCEA is reliable and valid.

In evaluating the victim in particular, Balduzzi followed the SCEA protocol. However, the victim was unable to respond to any question and, after four questions, Balduzzi discontinued the evaluation of the K-scale, as instructed in the SCEA manual. The victim was unable to demonstrate any basic knowledge relating to sex. In addition, with respect to the victim's self-protection abilities, Balduzzi interviewed the victim's caretakers and those who saw her on a daily basis and also reviewed documentation relating to the victim. Based on the information they provided, she reached the conclusion that the victim was unable to communicate "no," she lacks the ability to recognize a dangerous situation, she cannot plan for the future, and she lacks the ability to make a choice. According to Balduzzi, the victim did not pass either the knowledge or self-protection components of the assessment, and is not competent to consent to sexual activity.

Thus, we turn to whether the question at issue— whether the SCEA assessment used by Balduzzi is scientifically valid under the *Brown/O'Key* analysis. In particular, we consider each of seven factors set forth above in determining whether the evidence meets the standard for scientific validity.

1. *General acceptance in the field*

The SCEA was developed by incorporating input from hundreds of doctorate level practitioners in the field of psychology. In particular, practitioners with specialties in neuropsychology, developmental disability, brain trauma, and sexuality contributed to its development and the SCEA evaluates the areas that the majority of those agreed were "essential to the notion of competence to consent." Although the evaluation of individuals for competence to consent is a newer area in psychology and, according to Balduzzi, "most psychologists are unaware that there is such a tool," since its development, the SCEA has been deemed valid and reliable

in peer reviewed literature. All-in-all, we conclude that this factor does not weigh against the admission of the evidence.

### 2. *Expert's qualifications and stature*

Balduzzi has a doctorate in clinical psychology and has been practicing in Oregon since 2006. At the Oregon State Hospital, she worked with adult men with developmental disabilities and, in private practice, she has done psychological evaluations relating to sexuality. As part of her education, she took courses relating to assessment of competency. After she contracted with DHS to conduct evaluations of competence to consent to sexual activity, Balduzzi conducted an extensive literature review to further educate herself on that particular topic and "read a number of articles about [the SCEA] by the authors" of the tool. She began using the SCEA after she obtained the tool from the author and was instructed by the author on the tool's "manual and its administration." The author has made herself available to Balduzzi for consultation on the use of the SCEA as necessary. In our view, this factor weighs in favor of admissibility.

### 3. *Use that has been made of technique*

As the state notes, there are two potentially pertinent considerations under this factor—"how widely the protocol has been used" and "the goal of the protocol." *Sampson,* 167 Or App at 504 (noting the parties' disagreement about the meaning of "use" and evaluating both considerations); *see also State v. Lyons,* 124 Or App 598, 607-08, 863 P2d 1303 (1993), *aff'd,* 324 Or 256, 924 P2d 802 (1996) (evaluating how widely test was used and its suitability for the purpose used). The evidence does not establish that the SCEA is widely used. Rather, the tool is not commercially available and Balduzzi obtained it by contacting the author directly. With respect to the goal of the SCEA, it was developed specifically to evaluate the ability of a person to consent to sexual activity and was used by Balduzzi for that purpose. Furthermore, the evidence was presented in this case, where the victim was unable to testify, and, as Balduzzi observed, the tool is "well-suited for forensic cases because it addresses the very criteria that" in most places are central for defining competence. In our view, this factor does not weigh against

the admission of the evidence. *See State v. Romero*, 191 Or App 164, 173, 178, 81 P3d 714 (2003), *rev den*, 337 Or 248 (2004) (concluding that the trial court would have erred if it had excluded evidence of the basis of a lack of scientific reliability where the expert testified that the frequency of the use of the test was "very narrow" and that he could not "quantify how often it's used * * * with this specific domain for which it was intended").

4. *Operational standards controlling the technique and the potential rate of error*

The SCEA is a lengthy protocol that sets forth questions, and contains safeguards such as examples, sample responses, and specifies how and when an examiner should prompt for more information. According to Balduzzi, she followed the protocol in this case and, after the victim was unable to respond to four questions, she discontinued questioning as instructed in the SCEA manual. Furthermore, the potential rate of error is addressed, to some extent, in the 1999 study assessing the SCEA's reliability and validity. Again, in that study, "internal consistency reliability was measured using statistical analysis, and found to be .89 for the K-scale and .7 for the S-scale." Those results are "considered to be high in internal consistency reliability." The study also calculated "inter-rater reliability," that is, "the degree to which separate raters agree in their scoring of a tool." Statistical analysis "resulted in a finding of .96 for the K-scale, and .92 for the S-scale." Interrater reliability "for the overall competency determination was 1.0," that is, a "[p]erfect score." Thus, the study concluded that the SCEA "is reliable and valid." We conclude that this factor favors admissibility. *See Lyons*, 324 Or at 275 (scientific tests need not be infallible to be admissible).

5. *Existence of specialized literature and peer review*

Balduzzi testified that the author of the SCEA published extensively in peer-reviewed journals about its development, with the first publication in 1993. Later, in 1999, a research study assessing the reliability and validity of the SCEA was published in another peer reviewed journal. According to the results of that study, the K-scale and the S-scale were both "high in internal consistency reliability."

Furthermore, interrater reliability for the overall competency determination was determined to be perfect. Balduzzi also noted that there were several other articles relating to the SCEA. According to Balduzzi, the SCEA has "been field tested for the purposes of establishing its reliability and validity," it has "had professional eyes laid on it," and "it has been subjected to peer review." This factor weighs in favor of admissibility. *See Sampson*, 167 Or App at 508 (noting the defendant's failure to "cite peer reviewed articles that have effectively discredited the underlying theory" of the scientific evidence in question in concluding that specialized literature existed "to satisfy this *Brown/O'Key* factor" (internal quotation marks omitted)).

6. *Novelty*

Although novelty is a factor to be considered, it does not "imply invalidity." *O'Key*, 321 Or at 302 n 21 (noting that "every scientific theory must at some point be new" (internal quotation marks omitted)). The basic technique used in the SCEA—interview of the person evaluated and those who observe the person on a daily basis as well as a review of the documentation relating to the person—is not novel. Rather, it is routinely used in psychological evaluation. According to Balduzzi, the question of a person's competence to consent is not a psychological issue that comes up frequently, and, as noted, it is a newer area of psychology. However, the SCEA itself was published in 1993 and reviewed for reliability and validity in 1999. Thus, the protocol had existed for a number of years and has been reviewed with approval during that time. In our view, this factor does not weigh against the admission of the SCEA.

7. *Extent to which technique relies on expert's subjective interpretation*

The SCEA requires the evaluator to ask a series of questions and to base a conclusion regarding capacity to consent on the responses received. It is undisputed that the process of administering the SCEA requires some subjective evaluation of the information and responses obtained. However, because of the nature of the examination and the fact that it is conducted following an extensive protocol, including questions of others who observe the evaluated

person on a daily basis, the evidence is not wholly based on the expert's subjective interpretation and can, to an extent, be verified. *See O'Key*, 321 Or at 318-19 (observing that the scientific test in question "is based on subjective visual observation" and "cannot be duplicated" or "verified," but concluding that the test "is scientifically valid"). In any event, although the expert must engage in subjective interpretation of the information received in administering the SCEA, this factor does not render the evidence inadmissible.

Our consideration of those factors leads us to conclude that the SCEA is scientifically valid as required under the *Brown/O'Key* analysis. Accordingly, the trial court did not err in concluding that the evidence in question was admissible and we reject defendant's contention that Balduzzi's testimony should have been excluded as scientifically invalid.[6]

Affirmed.

---

[6] We note that defendant also contends that "Balduzzi's opinion was not only scientifically invalid, the prejudicial impact of her testimony outweighed its probative value." However, he did not raise that argument before the trial court. Instead, before the trial court, defendant asserted only that the evidence did not have an adequate scientific foundation. In particular, he contended that (1) the SCEA was not generally accepted in the field, (2) the potential rate of error did not support admission, (3) there was insufficient specialized literature, and (4) the technique relied extensively on subjective interpretation by the expert. Defendant made no reference to the requirement of OEC 403 that the probative value of the evidence not be outweighed by its potential prejudice and, instead, relied on his contention that the evidence should not be admitted because it was scientifically invalid. *See State v. Wyatt*, 331 Or 335, 343, 15 P3d 22 (2000) (to sufficiently preserve an argument, "a party must provide the trial court with an explanation of his or her objection that is specific enough to ensure that the court can identify its alleged error with enough clarity to permit it to consider and correct the error immediately, if correction is warranted"). Thus, we decline to address defendant's contention, made for the first time on appeal, that, in addition to being scientifically invalid, the evidence was subject to exclusion under OEC 403 because its prejudicial effect outweighed its probative value. *See* ORAP 5.45(1) ("No matter claimed as error will be considered on appeal unless the claim of error was preserved in the lower court * * *.").