Argued and submitted October 28, 2020; convictions on Counts 11 through 14 reversed, convictions on Counts 1, 2, and 7 reversed and remanded, remanded for resentencing, otherwise affirmed June 29, 2022

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

BRANDON MICHAEL HILDING,
*Defendant-Appellant.*

Lincoln County Circuit Court
18CR28793; A169256

514 P3d 79

Defendant appeals from a judgment of conviction for two counts of first-degree assault (Counts 1 and 2), one count of third-degree assault (Count 3), and nine counts of first-degree criminal mistreatment (Counts 4 to 7 and Counts 10 to 14). Those charges stem from injuries that the state alleged defendant caused his infant son. On appeal, defendant challenges the trial court's denial of his motions for judgment of acquittal on Count 2 and on Counts 11 to 14, the trial court's refusal to give his requested jury instruction for first-degree assault, which included a criminal negligence mental state for the result element, the trial court's limitation on the testimony of his expert, and the trial court's giving of a nonunanimous jury instruction and accepting nonunanimous jury verdicts on Counts 2 and 7. *Held*: (1) The trial court did not err in denying defendant's motion for judgment of acquittal on Count 2, because the state adduced sufficient evidence of a serious physical injury. (2) The trial court did err in denying defendant's motion for judgment of acquittal on Counts 11 to 14, because the legal theory on which the court relied was not legally cognizable under the Supreme Court's construction of the applicable statute. (3) The trial court erred in refusing to give defendant's requested jury instruction for first-degree assault and the error was not harmless. (4) The trial court did not err in limiting the testimony of defendant's expert. (5) The trial court plainly erred in giving a nonunanimous jury instruction, which requires reversal of the counts for which the jury verdicts were nonunanimous.

Convictions on Counts 11 through 14 reversed; convictions on Counts 1, 2, and 7 reversed and remanded; remanded for resentencing; otherwise affirmed.

Sheryl Bachart, Judge.

George W. Kelly argued the cause and filed the briefs for appellant.

Christopher A. Perdue, Assistant Attorney General, argued the cause for respondent. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, and Shorr, Judge, and Powers, Judge.

ORTEGA, P. J.

Convictions on Counts 11 through 14 reversed; convictions on Counts 1, 2, and 7 reversed and remanded; remanded for resentencing; otherwise affirmed.

## ORTEGA, P. J.

Defendant appeals from a judgment of conviction for two counts of first-degree assault (Counts 1 and 2), one count of third-degree assault (Count 3), and nine counts of first-degree criminal mistreatment (Counts 4 to 7 and Counts 10 to 14). Those charges stem from injuries that the state alleged defendant caused his son, C, when C was between the ages of two and five months old. Defendant raises four assignments of error on appeal and one supplemental assignment of error.

In his first two assignments, defendant challenges the trial court's denial of his motions for judgment of acquittal on Count 2 and on Counts 11 to 14. With respect to Count 2, first-degree assault, the state adduced sufficient evidence of a serious physical injury and thus the court did not err in denying defendant's motion. However, with respect to Counts 11 to 14, first-degree criminal mistreatment, the trial court erred in denying defendant's motion, because the legal theory on which the court relied is not legally cognizable under the Supreme Court's construction of ORS 163.205(1)(a) articulated in *State v. Baker-Krofft*, 348 Or 655, 662, 239 P3d 226 (2010). We thus reverse those counts.

In his third assignment of error, defendant challenges the trial court's refusal to give his requested jury instruction for first-degree assault, which included a criminal negligence mental state for the result element. Based on *State v. Owen*, 369 Or 288, 505 P3d 953 (2022), we agree with defendant that the trial court erred, and we further conclude that, under the circumstances of this case, that error was not harmless. We thus reverse and remand Counts 1 and 2.

In his fourth assignment of error, defendant challenges the court's limitation on the testimony of his expert, Dr. Hyman. Specifically, the court excluded Hyman's diagnosis that C had "temporary bone fragility" and determined that Hyman was not qualified to render a child-abuse diagnosis. We conclude that the trial court did not err.

Finally, in his supplemental assignment of error, defendant argues that the trial court plainly erred in giving a nonunanimous jury instruction and that all of his convictions should be reversed as a result. The state concedes that defendant is entitled to reversal on the nonunanimous counts, Counts 2 and 7, under *Ramos v. Louisiana*, 590 US ___, 140 S Ct 1390, 206 L Ed 2d 583 (2020), and *State v. Ulery*, 366 Or 500, 504, 464 P3d 1123 (2020). We agree and accept the state's concession. As for the remaining convictions by unanimous verdict, we conclude that any error in giving the nonunanimous jury instruction was harmless. *State v. Flores Ramos*, 367 Or 292, 478 P3d 515 (2020).

In sum, we reverse and remand defendant's convictions on Counts 1, 2, and 7, reverse his convictions on Counts 11 through 14, remand for resentencing, and otherwise affirm.

For purposes of reviewing the trial court's denial of defendant's motions for judgment of acquittal, "we view the evidence in the light most favorable to the state." *State v. Nickles*, 299 Or App 561, 562, 451 P3d 624 (2019). We provide the following background facts with that standard in mind. To the extent we must consider other facts, or with a different standard in mind, to address defendant's other assignments of error, we do so in the analysis of those other assignments.

Defendant is C's father. C was born prematurely at 33 weeks in November 2017. His birth was uncomplicated, and he showed no signs of injury from the birth process; he did not show any signs of pain or weakness in his extremities or any sign of a skull fracture or a subdural hematoma. Dr. Lam, who treated C while he was in the hospital after his premature birth, testified that the injuries that C suffered between the ages of two and five months would not have been caused by his birth. While C was in the hospital following his birth, both defendant and C's mother received education on how to calm a crying baby, the consequences of shaking a baby, fall risks to a baby, and safe sleep for a baby.

C and his parents lived with friends for about six weeks after his birth. During that time, defendant saw bruises on C's arm, and he showed C's mother. C's mother

testified that C did not have the bruise when she left C with defendant. Also during this time, C's mother, in a follow-up medical appointment after C experienced jaundice, asked about bleeding that she saw in C's mouth, but the nursing assistant did not find a source of trauma.

C and his parents next lived with C's maternal grandparents for about a month. C's grandmother testified that C cried a lot, was anxious and hard to soothe, that defendant would wear headphones at night and not attend to C when he cried, and that, at some point, she saw bruising on C's arm, leg, and on his head over his eyebrow. C also suffered bruising to his mouth when defendant forcefully held a pacifier in C's mouth when he would not stop crying. C's grandfather also saw bruises on C's arm and leg like "somebody had grabbed him too hard." C's grandmother also thought that defendant was a little too rough with C and that he swaddled C too tight.

On January 22, 2018, C's mother took him to the emergency room because he was sick and having difficulty breathing. C was diagnosed with bronchiolitis, or an inflammation of the lungs, and required treatment in the hospital. C's mother reported that he had been sick for several days, was coughing, and had not been feeding well. Defendant expressed a concern that C had cracked ribs from coughing because he could feel some crackling in his torso. The treating doctor, Dr. Dourgarian, found defendant's question strange and troubling, because it would not be normal for a baby to have crackling over their ribs or to have a rib injury from coughing. When asked, C's parents did not report that C had fallen or had an injury. Dourgarian testified that rib fractures in infants are very abnormal because their ribs are mostly cartilage and difficult to break and "it takes quite a bit of force to break an infant's ribs." Dourgarian followed up with a regular x-ray, mostly because of C's breathing difficulty. On the first report, the radiologist could not rule out rib fractures. A second x-ray was taken, and the second radiologist did not see signs of rib fractures. C's mother again took C to the ER a week later on January 30, because of a cough, congestion, and difficulty breathing. The hospital again took chest x-rays of C.

Also around the end of January, C's parents moved out of C's grandparents' house and began living with a friend, Ray, where they stayed until April. While they lived there, C's mother worked, but defendant did not and would watch C, unless C's mother found someone else to babysit. Ray testified that defendant would swaddle C too tight and would be forceful with holding the bottle to C's mouth when C refused the bottle. Ray also saw bruises on C's forehead and arm while he was living there. During that time period, C's mother also twice noticed bruises on C; once he had bruises "all over his head," which defendant attributed to C "head butting" his head into defendant's chest, and he attributed another bruise to C flipping himself out of defendant's lap.

On February 18, while Ray was home with defendant and C, C stopped breathing. Ray called 9-1-1. On recommendation of the 9-1-1 operator, defendant performed CPR on C for about 20 seconds. When the ambulance arrived, C was crying, breathing normally, and his color was good. C did not have swelling or bruising to his chest from the CPR, and he was not showing signs of pain. C's mother arrived before the ambulance left, and she rode with C to the hospital. At the hospital, the treating doctor could not find a medical reason for the event. He testified that those types of episodes are called a "brief resolved unexplained event" or BRUE. During that hospital stay, C again had x-rays of his torso.

On February 20, C's mother called his primary doctor, Dr. Wherry, because C was vomiting, not eating well, and had some cough and congestion. Wherry reported that C was irritable and screaming but otherwise "looked very well." On March 8, C's mother called again, concerned that C continued to be sick. A different doctor treated C, and she noted that C's soft spot felt a little more full, and C had a small bruise on his forehead. Defendant told the doctor that C had rolled onto the floor from a mattress that was sitting on the floor.

In April, C's parents moved in with Hernandez. During that time, C's mother worked two jobs and defendant primarily watched C. Hernandez was also often home with her own child at the same time and observed that defendant

was rough with C and that C would cry a lot and defendant would ignore C's cries. She testified that once defendant came home drunk, picked up C, who was crying, and took him into the bedroom for a nap, while talking aggressively to C. When C got up from the nap, he had a bruise on his face from the bottom of his eye to his cheek. C's mother also related the same incident and that defendant could not explain the bruise. Hernandez also saw C with a lip injury and with a bruise on his ear about the size of a quarter.

On April 3, C's mother called Wherry, concerned that C was vomiting and not able to keep any food down. On advice from Wherry's office, she took C to the emergency room. The hospital believed the cause was a viral infection and gave C a medication to stop his vomiting.

On April 23, C's mother again called Wherry, concerned that C was acting abnormally, that his soft spot was strange, and that he had some bruising along his head. At an appointment on April 25, Wherry noted that C's soft spot was "bulging" and his head circumference was significantly larger. Wherry ordered blood labs which showed that C did not have a bleeding disorder, but he could not get insurance approval for a head CT right away and sent C home with his mother. The CT was approved the next day, April 26.

On that follow-up visit, Wherry noted that C's head circumference was about the same as the previous day and also noticed a bruise on his foot. The CT showed that C had subacute subdural hematomas on the right and left side, with the one on the right slightly larger and more hyperattenuated than the one on the left, which meant that the hematomas were different ages and that the right side probably had rebleeding from a repeat trauma. At that point, Wherry believed that C had had a nonaccidental trauma, and C was transferred to Randall's Children's Hospital.

At Randall's, Dr. Zoeller, a pediatric neurosurgeon, performed surgery to remove the blood and relieve pressure on C's brain. Zoeller testified that C's scans showed a large collection of blood near the brain that required surgery, some brain atrophy consistent with injury, and a skull fracture. At the time, however, C did not have bruising, indicating

that the fracture was more than a few days old. Zoeller also testified that the enlarged size of C's head indicated that blood had been accumulating for some time, but also that the presence of newer bleeding indicated that C had more than one injury. Zoeller testified that the type of trauma he observed in C could cause a baby to stop breathing, be fussy and difficult to calm, and have seizures. Zoeller opined that C's vomiting incidents were related to the head trauma, because the increasing pressure from the blood on the brain can cause vomiting. He also opined that the bleeding could only have been caused by trauma and was not caused by birth-related trauma because of the location of the fracture, the amount of blood, and that C was five months old. Zoeller testified that C did not have brittle bone disease because the imaging showed "nice thick bone."

A pediatric radiologist at Randall's reviewed the chest x-rays taken during C's three hospital visits on January 22, January 30, and February 18, and found rib fractures present on all three dates. A skeletal survey of C on April 28 showed a right skull fracture, multiple rib fractures on both sides, some of which were healed, a healing fracture to the forearm, and a bone injury in his leg. That April scan showed that C had rib fractures that were not present in January and February.

Dr. Adewusi, a pediatrician with CARES Northwest, checked for bone or bleeding issues that could explain C's injuries, but did not find any. Adewusi testified that C's head trauma was consistent with violent, repetitive movement, like being thrown, and that symptoms could include being fussy, vomiting, stopping breathing, coma, and death. The parents' explanations for C's injuries did not match the reported bruising that C had. Adewusi also testified that it would require significant compression force or blunt force trauma to cause the rib fractures that C had and that fractures from CPR on infants is rare. Adewusi also testified that a rib fracture could also cause internal injury, like a contusion to the lungs, which would be concerning for "significant morbidity." Adewusi also confirmed that studies have found that the odds of mortality in children increases with each additional rib fracture.

In speaking with detectives, defendant never blamed C's mother for C's injuries. Rather, he took responsibility for them, but offered accidental causes, including that C rolled off the mattress, would head-butt defendant's chin, and fell off the couch, that defendant had dropped C once after he had been drinking alcohol, and that C "back-flipped" out of defendant's arms about a month and a half earlier. Defendant also admitted to detectives that he sometimes gets "black-out drunk," that "things" could have happened to C when defendant was drinking, that he probably did hurt C when he was drunk, and that, until recently, he was drinking almost every day. Defendant also admitted that, a couple of days before C's surgery, he got mad at C and threw him into his crib and "heard a thunk," which could have been C's head hitting the wall. Defendant also said that C's ribs could have been injured because he might have squeezed C when he was drunk.

In messages between defendant and C's mother on four different dates in March, defendant made statements, including that he "can't do this" and was about to "walk off," that he was scared he will "snap" and hurt C and that he did not want to be alone with C, that C would not stop crying and defendant was about to "blow up" and "walk out," and that C had bruises on his head because he head-butted defendant. On April 18, defendant messaged C's mother that he is "afraid to touch him" and that he is not a good father.

C was placed in foster care immediately following his discharge from the hospital after his brain surgery. He did not have any further injuries or suspicious bruising. His emergency-care foster mother testified that C never head-butted or caused injury to himself during the five days he was with her. C's foster mother, who had continuous care of C after those five days and through trial, testified that, on his arrival to her home, C had developmental delays, such as not being able to sit up or support his head, not rolling over, not using his left arm, and not babbling. Before C started crawling, she never observed C to bruise himself or to butt his head. Since his foster placement, C has improved, but still has some developmental delays in communication and cognitive processing.

At the close of the state's case, and as relevant to his appeal, defendant moved for judgments of acquittal on Count 2, first-degree assault, and Counts 11 through 14, first-degree criminal mistreatment. For Count 2, the indictment alleged that, on or about the period between November 20, 2017 and January 22, 2018, defendant knowingly caused serious physical injury to C's ribs and torso. Defendant argued that the state had failed to prove that C's rib injuries met the standard of serious physical injury, because there was no testimony that the fractures created a substantial risk of death.[1] The state's theory was that C's physical injury created a substantial risk of death because the injury to C's ribs or torso contributed to the February 18 BRUE when C stopped breathing. The trial court denied the motion, ruling that, based on testimony that the type of trauma to C's ribs required a level of force that could cause respiratory problems, the jury could infer that the BRUE on February 18 was related to that injury.

For Counts 11 through 14, first-degree criminal mistreatment, the indictment alleged that, with respect to four different date ranges, defendant knowingly withheld necessary and adequate physical care from C. The state's theory was that, between January and April 2018, defendant was C's primary caretaker and, during that time, he paid inadequate attention to C—left C in his crib for long periods, failed to feed him, and ignored his crying while playing video games—and that, despite knowing that C was injured in his care and that he, at least once, dropped C while he was drunk, he continued to care for C and to drink while caring for C. The state clarified that it was not arguing that defendant failed to provide medical care for C. Defendant argued that the state's theory did not allege anything that rose to the level of withholding care from C for purposes of first-degree criminal mistreatment.

The trial court denied defendant's motion, relying on *State v. Burciaga*, 263 Or App 440, 328 P3d 782, *adh'd*

---

[1] A "serious physical injury" means "physical injury which creates a substantial risk of death or which causes serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ." ORS 161.015(8). "Physical injury" means "impairment of physical condition or substantial pain." ORS 161.015(7).

*to as modified on recons*, 264 Or App 506, 333 P3d 1098, *rev den*, 356 Or 575 (2014). The court reasoned that there was sufficient evidence that defendant withheld care by continuing as C's primary caretaker although he knew that C was experiencing injuries and defendant expressed fear that he was hurting or would hurt C because of his anger, frustration, and blackouts from drinking. In so ruling, the court emphasized that the unique feature of the case was that defendant was aware that he posed a risk to C, but he continued to care for C after each time that C was injured. The court reasoned that, due to C's age, necessary physical care of C included ensuring that he did not sustain bruises or fractures. The court summarized its reasoning this way:

> "So in relying on the *Burciaga* case, here it's the * * * knowingly withholding necessary and adequate physical care. If the Court can find that a defendant can be guilty of criminal mistreatment for knowingly withholding necessary and physical care from leaving a child in the care of somebody who is known to be physically abusive towards minor children who are nonverbal and not able to protect themselves, a defendant could also be found guilty of continuing to care for an infant where he is repeatedly * * * frustrated, and when he becomes frustrated he becomes physically abusive. * * * The evidence that's been presented here is his own consciousness of his frustration and his anger and fear of himself."

On appeal, defendant challenges the court's denial of his motions on Count 2 and on Counts 11 through 14. On review of a denial of a motion for judgment of acquittal, we examine the evidence "in the light most favorable to the state to determine whether a rational trier of fact, accepting reasonable inferences and reasonable credibility choices, could have found the essential element of the crime beyond a reasonable doubt." *State v. Cunningham*, 320 Or 47, 63, 880 P2d 431 (1994), *cert den*, 514 US 1005 (1995).

With respect to Count 2, in his first assignment of error, defendant argues that the court erred because there was no evidence from which the jury could infer that C's February 18 BRUE was caused by the fractures to his ribs that were visible in the x-rays taken on January 22, which was the end of the date range alleged in that count. Having

reviewed the evidence in the light most favorable to the state, we conclude that the state adduced sufficient evidence from which a rational jury could find beyond a reasonable doubt that C's rib injuries were caused with sufficient force to also cause respiratory problems that contributed to C's February 18 BRUE. Thus, the trial court did not err in denying defendant's motion for judgment of acquittal as to that count.

With respect to Counts 11 through 14, in his second assignment of error, defendant argues that the trial court erred when it extended *Burciaga* to his case, because that reading would allow the state to charge an additional criminal mistreatment count, based on withholding of physical care,[2] with every instance that a person abuses a child more than once. Defendant argues that continuing to care for a child even though the person knows that they could pose a risk to that child when drinking or frustrated is not the conduct that the legislature intended to cover in the withholding of care section of the first-degree criminal mistreatment statute. Rather, defendant argues, the statute is directed at precisely what it states, withholding of care, which is a failure to attend to the child's bodily needs, and an abuser does not withhold care simply by allowing themselves to be around a child.

The state responds that, given the evidence in this case, defendant could be convicted of criminal mistreatment for his pattern of neglect and carelessness with C. The state argues that, "[p]ut simply, defendant failed to provide the necessary attention that C required when [defendant] repeatedly drank to excess yet assumed responsibility for care for C." Here, the state asserts, it was not the abuse itself that amounted to withholding of care, it was "defendant's more general pattern of violent drunkenness and

---

[2] First-degree criminal mistreatment also applies if

"[t]he person, in violation of a legal duty to provide care for a dependent person or elderly person, or having assumed the permanent or temporary care, custody or responsibility for the supervision of a dependent person or elderly person, intentionally or knowingly *** [c]auses physical injury or injuries to the dependent person or elderly person[.]"

ORS 163.205(1)(b)(A). Defendant was convicted of first-degree criminal mistreatment in Counts 4 to 7 and 10 based on that theory.

gross inattentiveness [that] established a failure to attend to C's physical needs."

To begin our analysis, we emphasize the basis on which the trial court denied defendant's motion. Its ruling was based on an explicit extension of the theory present in *Burciaga*—that defendant left C in defendant's own care despite knowing that he was physically abusive toward C when frustrated or drunk. That is not, as the state asserts, a theory based on defendant's "more general pattern" of violent drunkenness and inattentiveness; it is a theory that defendant withheld physical care from C through the act of assuming responsibility for C's care despite knowing the risk of physical abuse he posed to C. Thus, the question before us is whether that theory is legally cognizable under ORS 163.205(1)(a), the section of the first-degree criminal mistreatment statute at issue. We conclude that it is not.

We begin with a brief overview of the law on which the trial court relied. The relevant section of the first-degree criminal mistreatment statute provides:

"(1)   A person commits the crime of criminal mistreatment in the first degree if:

"(a)   The person, in violation of a legal duty to provide care for another person, or having assumed the permanent or temporary care, custody or responsibility for the supervision of another person, intentionally or knowingly withholds necessary and adequate food, physical care or medical attention from that other person[.]"

ORS 163.205(1)(a).

In *Baker-Krofft*, the Supreme Court interpreted the phrase "withholds necessary and adequate *** physical care" to mean "the defendant keeps back from the dependent person those physical services and attention that are necessary to provide for the dependent person's bodily needs." 348 Or at 662. The court rejected the state's proffered interpretation, which would have included in the definition "creating or failing to correct any and all dangers to the child's safety." *Id.* The court noted that the state's interpretation did not square with the text, because it converted the verb "withhold" to "create" or "fail to correct," and thereby converted

the prohibition on withholding specific services "into a pro-
hibition against creating any and all risks to a dependent
person's health," and converted "a statute that prohibits a
present deprivation of services or attention into one that
prohibits creating a risk of future harm." *Id.* at 662-63.

In *Burciaga*, we extended the Supreme Court's rea-
soning to circumstances where the defendant had left her
two children, J and N, in the care of Ros, who had previ-
ously physically abused J when the child was two years old,
resulting in a fourth-degree assault conviction. 263 Or App
at 442. After that conviction, the defendant left the children
alone with Ros two more times—when J was three years old
and N two years old—during which time he again assaulted
J. The defendant then left the children in Ros's care a third
time, during which time Ros assaulted N, resulting in N's
death. *Id.* at 443. The state's theory for two of the counts of
first-degree criminal mistreatment against the defendant
was that, by leaving her children in the care of Ros, who
she knew had assaulted one of the children, the defendant
withheld from her children "the physical care required to
meet their basic safety and survival needs and left them in a
condition almost certain to cause them serious physical pain
and injury." *Id.* at 444.

We reasoned that the court in *Baker-Krofft* had
suggested "that necessary and adequate physical care
may include some types of preventative or protective care."
*Burciaga*, 263 Or App at 448 (internal citations omitted). We
concluded that the rule that the court announced "d[id] not
preclude the possibility that necessary and adequate phys-
ical care of a dependent person includes protecting the per-
son from certain types of future harms." *Id.* at 449. In terms
of the case before us, we concluded that the state presented
sufficient evidence that the defendant had withheld neces-
sary and adequate physical care from her two children. In
particular, the defendant withheld her attention from them,
which,

> "under the circumstances, was necessary to provide for
> their basic bodily needs, indeed for their survival. * * *
> Defendant put her children in a situation where there was
> a substantial risk that they would suffer serious harm and

then she turned her back on them. Her conduct constituted a present deprivation of essential physical care."

*Id*.

This case presents circumstances that are not comparable to those present in *Burciaga*. Here, defendant did not withhold his attention from C. Indeed, it was his attention that presented the safety risk to C—the attention he gave to C when he was drunk or frustrated was abusive attention. A person cannot withhold necessary and adequate physical care from a dependent person through the act of continuing to care for the dependent person, as reasoned by the trial court. The gravamen of the charge is missing under that line of reasoning—the keeping back of a necessary service from the dependent person. *See Baker-Krofft*, 348 Or at 662 (concluding that "the statutes rest on the premise that the actor keeps back something (food, physical care, or medical attention) from a person who would not otherwise be able to obtain it for him or herself").[3] Extending the statute to encompass the conduct here would prohibit what the Supreme Court in *Baker-Krofft* said ORS 163.205(1)(a) does not prohibit. Accordingly, the trial court erred in denying defendant's motion for judgment of acquittal on Counts 11 through 14, and we reverse the convictions on those counts.

We turn next to defendant's third assignment of error, in which he challenges the trial court's jury instructions on Counts 1 and 2, first-degree assault. Defendant had requested a jury instruction that included a culpable mental state of criminal negligence for the result element of serious physical injury on those counts. The court declined to give that instruction.

Based on recent cases, we agree with defendant that the trial court erred in not giving the requested instruction. In *Owen*, the Supreme Court held that the result

---

[3] *See also Baker-Krofft*, 348 Or at 665-66 (reciting the legislative history, which includes commentary that the statute sought to reach conduct not covered by the criminal code, such as withholding food or other services; that commentary stated that, "if it's a physical abuse thing where somebody actually hits someone, the criminal code takes care of that [already]" (quoting Tape Recording, Senate Floor, SB 780, June 29, 1973, Tape 32, Side 1 (statement of Sen Wallace P. Carson) (brackets in *Baker-Krofft*))).

element—physical injury—in the crime of second-degree assault carries, at a minimum, a culpable mental state of criminal negligence. 369 Or at 321-22. The court further held that a court errs when it fails to instruct the jury that a defendant must act with a culpable mental state as to the element of causing physical injury. *Id.* at 322; *see also State v. McKinney/Shiffer*, 369 Or 325, 505 P3d 946 (2022). The same reasoning applies to the result element—serious physical injury—of first-degree assault as charged in this case. *See* ORS 163.185(1)(b) ("A person commits the crime of assault in the first degree if the person *** [i]ntentionally or knowingly causes serious physical injury to a child under six years of age."). Here, defendant requested a jury instruction that applied a culpable mental state of criminal negligence to the injury element of first-degree assault. Based on *Owen*, defendant was entitled to have the court deliver the requested instruction and the court erred in not doing that. *See State v. McNally*, 361 Or 314, 320, 392 P3d 721 (2017) ("A criminal defendant is entitled to have the jury instructed in accordance with his or her theory of the case if the instruction correctly states the law and there is evidence to support giving it."); *State v. Jury*, 185 Or App 132, 137, 57 P3d 970 (2002), *rev den*, 335 Or 504 (2003) ("The 'benchmark' for error is the law existing as of the time the appeal is decided.").

Having concluded that the trial court erred, we must determine whether that error was nonetheless harmless. *State v. Davis*, 336 Or 19, 33, 77 P3d 1111 (2003) (trial court error is harmless if there was "little likelihood that the error affected the jury's verdict"). "To make that determination, we consider the instructions 'as a whole and in the context of the evidence and record at trial, including the parties' theories of the case with respect to the various charges and defenses at issue.'" *Owen*, 369 Or at 323 (quoting *State v. Payne*, 366 Or 588, 609, 468 P3d 445 (2020)). "The party requesting an instruction is prejudiced if the trial court's failure to give the requested instruction probably created an erroneous impression of the law in the minds of the members of the jury, and if that erroneous impression may have affected the outcome of the case." *Hernandez v. Barbo Machinery Co.*, 327 Or 99, 106-07, 957 P2d 147 (1998).

Here, the court instructed the jury that it had to find that defendant "acted with an awareness of the assaultive nature of his conduct. It does not require he was necessarily aware of the seriousness of the injury that resulted from the conduct." The court did not instruct the jury on the meaning of "assaultive." The court further instructed the jury:

> "The term 'physical injury' means an injury that impairs a person's physical condition or causes substantial pain. The term 'serious physical injury' means a physical injury that either: (1) creates a substantial risk of death, or (2) causes serious and protracted disfigurement, or (3) causes protracted impairment of health, or (4) causes protracted loss or impairment of the function of any bodily organ."

In argument to the jury, the state presented its theory of the case for Counts 1 and 2 in line with those instructions, arguing that defendant caused C's head and torso injuries by some type of conduct that occurred while he was alone with C when C was in his care and that those injuries created a substantial risk of death to C. The state emphasized that "[defendant] does not have to know that what he's doing is going to cause serious physical injury or put the child at risk of death. But he has to know that his conduct is assaultive."

In the circumstances of this case, we conclude that, had the jury been instructed on the culpable mental state for the serious physical injury element, it could have made a difference in the outcome of the case. Criminal negligence

> "means that a person fails to be aware of a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that the failure to be aware of it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation."

ORS 161.085(10). Although the jury found that defendant was aware of the assaultive nature of his conduct, based on the jury instructions, it is not clear that the jury necessarily would have also found that defendant failed to be aware of a substantial risk that his conduct would cause C an injury that created a substantial risk of death and that the risk was of such a nature and degree that defendant's failure

to be aware of it was a gross deviation from the standard of care a reasonable person would observe in the situation. This is not a situation where the nature of the assaultive conduct—which in this case was unknown—or other given instructions necessarily encompassed a culpability standard with respect to the serious physical injury element of first-degree assault. *Cf. Owen*, 369 Or at 324 (error was harmless where, based on the jury instructions, the jury found that the defendant knew that his conduct was assaultive and knew that the weapons he used were "readily capable of causing serious physical injury," because, even if instructed on criminal negligence for the element of "physical injury," "the jury would not have found that defendant was unaware that his actions would cause D physical injuries"); *State v. Chemxananou*, 319 Or App 636, 640, 510 P3d 954 (2022) ("The jury found that defendant, with an awareness that his conduct was assaultive in nature, strangled and kicked K, hit the back of N's head with a plate, and punched N in the face. It is implausible that the jury, having found that defendant knowingly took those actions, would then find that he was not at least negligent with respect to the fact that the children could be injured as a result."). As a result, we reverse and remand Counts 1 and 2.

Finally, we address defendant's fourth assignment of error, in which he argues that the trial court erred when it excluded Dr. Hyman, defendant's expert, from testifying that he had diagnosed C with temporary bone fragility and further excluded Hyman from giving an opinion about whether C had been abused. As explained below, we conclude that the trial court did not err.

Before trial, the state sought to exclude or limit Hyman's testimony and requested a OEC 104 hearing to determine if his testimony met the threshold standard of admissibility for scientific evidence under the factors in *State v. Brown*, 297 Or 404, 687 P2d 751 (1984), and *State v. O'Key*, 321 Or 285, 899 P2d 663 (1995).[4] At the OEC 104 hearing,

_____

[4] *Brown* set out seven nonexclusive factors to use as guidelines to determine if scientific evidence has met the threshold of admissibility: "(1) The technique's general acceptance in the field"; "(2) The expert's qualifications and stature"; "(3) The use which has been made of the technique"; "(4) The potential rate of error"; "(5) The existence of specialized literature"; "(6) The novelty of the invention";

defendant made an extensive offer of proof of Hyman's testimony. Because it would not be beneficial to the bench or bar, we do not summarize the record at length and only refer to the most pertinent parts in our analysis.

Following the offer of proof, the trial court concluded that it would limit Hyman's testimony in certain respects. First, the court ruled that Hyman could testify about his expertise in the fields of pediatrics and bone science and about factors that affect bone strength, and that he could talk about the term "temporary bone fragility." The court also ruled that Hyman could express his view on what he believed the radiology of C's bones showed. However, the court ruled that Hyman could not offer a diagnosis of temporary bone fragility, because it did not meet the *Brown* and *O'Key* threshold for scientific testimony "regarding an actual diagnosis that he came to in this particular case."[5]

The court also ruled that Hyman was not qualified as an expert in the field of child-abuse pediatrics such that he could render an opinion about whether C was abused. The court explained that a child-abuse diagnosis was allowed as scientific testimony, as established by the state's expert, but Hyman testified that he expressly rejects the medical field of child-abuse pediatrics as a science and that he has not seen clinical patients since 1999. The court stated that "it's through his own testimony and his rejection of that area of science that leads to his disqualification as an expert in the field of child abuse [pediatrics]." The court did permit Hyman to testify about whether C's injuries were consistent with the explanations given by defendant or what Hyman believed was the amount of force required to cause those

---

and "(7) The extent to which the technique relies on the subjective interpretation of the expert." *Brown*, 297 Or at 417.

The Supreme Court in *O'Key* also discussed four additional factors that may be useful, and which overlap somewhat with the *Brown* factors: (1) "whether the theory or technique in question can be (and has been tested)"; (2) "whether the theory or technique has been subject to peer review and publication"; (3) "the known or potential rate of error and the existence of operational standards controlling the technique's operation"; and (4) "the degree of acceptance in the relevant scientific community." *O'Key*, 321 Or at 303-04 (internal quotation marks omitted).

[5] In making that ruling, the trial court agreed with the state's argument of how to apply the *Brown* and *O'Key* factors.

injuries. The court also permitted Hyman to testify about his opinion of the field of child-abuse pediatrics, with a limiting instruction about hearsay if he were to rely on specific studies for that opinion.

On appeal, defendant argues that the trial court erred because the *Brown* and *O'Key* factors favored admitting Hyman's diagnosis of temporary bone fragility. Defendant also argues that the court erred in not allowing Hyman to express his opinion on the diagnosis of child abuse, because the court did not base its opinion about Hyman's lack of expertise on Hyman's credentials, but rather on his rejection of the child-abuse pediatric field as a science. Defendant asserts that Hyman's credentials were sufficient, and that he is not alone in his criticism of the child-abuse scientific community.

We review the trial court's rulings on the admissibility of scientific evidence for legal error. *State v. Reed*, 268 Or App 734, 738, 343 P3d 680, *rev den*, 357 Or 551 (2015). "Under *Brown* and *O'Key*, scientific evidence is admissible if it is relevant under OEC 401, helpful to the trier of fact under OEC 702, and not subject to exclusion under OEC 403." *State v. Perry*, 347 Or 110, 121, 218 P3d 95 (2009). Here, we need only address the admissibility of the testimony under OEC 702.[6] There are three general requirements a proponent of evidence must meet for the admission of expert testimony: (1) the witness must qualify as an expert on the particular topic, (2) the expert's testimony must be helpful to the jury, and (3) the testimony must have an adequate foundation. *State v. Trujillo*, 271 Or App 785, 791, 353 P3d 609, *rev den*, 358 Or 146 (2015). For scientific testimony, "the proponent of the evidence must demonstrate that an expert's scientific testimony is based on 'scientifically valid principles' and 'is pertinent to the issue to which it is directed.'" *Id.* (quoting *O'Key*, 321 Or at 303). The *Brown* and *O'Key* factors help a trial court determine whether the proffered scientific testimony meets that threshold. *Id.* Here, the court excluded

_____

[6] OEC 702 provides:

"If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

Hyman's diagnosis of temporary bone fragility based on the lack of adequate foundation and excluded Hyman's diagnosis relative to child abuse based on a lack of qualification. We address those bases in turn.

With regard to Hyman's diagnosis of temporary bone fragility, Hyman testified in the offer of proof that bone fragility is defined as fractures due to low force trauma, regardless of how the fractures look, which he determines occurs when there is a lack of evidence of high force trauma, such as a lack of internal injuries with rib fractures and fractures that were not detected by the parent or medical examiners. Hyman testified that he diagnosed C with bone fragility based on a lack of evidence of high force trauma for C's injuries. He also testified that C had a history that suggested that he had weakened bones and that C's radiology supported Hyman's diagnosis of temporary bone fragility. Hyman, however, could not describe a set of diagnostic criteria for the condition and could not point to a single peer-reviewed article or text from the medical community that supports the diagnosis in an infant; he only stated simply, and without references, that it is an accepted diagnosis in the field of bone science. Hyman admitted that the diagnosis is not accepted in the child-abuse pediatric community and that he formerly diagnosed the same condition as "temporary brittle bone disease" which he admitted had been discredited "by the child abuse people." Hyman admitted that pediatric radiologists had submitted a letter and a peer-reviewed article refuting his diagnostic theories, but stated that those critiques were "all flawed."

We conclude that the trial court did not err in excluding Hyman's diagnosis of temporary bone fragility. Hyman could not describe a process or set of criteria he used to arrive at the diagnosis, relying primarily on not having definitive evidence that high force was used to break C's bones. Hyman also could not explain "the standard practices, research, literature, guidelines or protocols that justified [his] reasoning." *State v. Sanchez-Alfonso*, 352 Or 790, 804, 293 P3d 1011 (2012) (concluding doctor's diagnosis of child abuse did not meet threshold for scientific testimony where she "did not identify the potential causes of C's injuries nor explain how or why she had ruled one of these causes in,

and others out" and she did not explain the scientific bases to justify her reasoning). As explained in *Sanchez-Alfonso*,

> "[t]o conclude that scientific evidence is sufficiently reliable to be admissible under OEC 702, it is not enough that there are experts on a subject, that the person who testifies is credible, or that evidence takes the form of a medical record. Neither is it enough that 'a lot' of literature exists on the subject or that the expert gathers the information to which that literature refers and conducts a differential diagnosis. Instead, the expert must explain more precisely his or her own expertise, how he or she gathers and uses particular information, how that information informs his or her conclusions, and the scientific basis for the steps that he or she takes in the process."

*Id*. Although Hyman could describe his experience in "bone science" and the information he used to make the bone fragility diagnosis, his testimony lacked an explanation of the scientific basis for the diagnosis itself or the process used to arrive at it, and it failed to demonstrate that the diagnosis and process were generally accepted or supported by literature in the field. Defendant, as the proponent of the scientific testimony, did not meet his burden to demonstrate that Hyman's diagnosis was based on scientifically valid principles. *See, e.g., Trujillo*, 271 Or App at 791. Accordingly, the trial court did not err in excluding Hyman from testifying that he diagnosed C with temporary bone fragility.

Finally, we address defendant's claimed error with regard to Hyman's opinion on the diagnosis of child abuse for C.[7] At the OEC 104 hearing, Hyman testified that he had never been board-certified as a child-abuse pediatrician, had never taken a fellowship in child-abuse pediatrics, and had not seen a clinical pediatric patient since 1999, but he testified that he read all the child-abuse journals and that was all he needed to do. He also testified that child-abuse pediatricians do not use any techniques other than learning the teaching points of the "child-abuse community," that the field is not based on science, that he rejects the diagnostic criteria used by the child-abuse pediatric field, and that child-abuse interpretation is "very subjective." The

---

[7] We reject the state's assertion that defendant failed to preserve his claim of error in this respect.

trial court ruled that Hyman could not be qualified as an expert for purposes of making a scientific child-abuse diagnosis of C, because he rejected the entire child-abuse pediatric field as not scientific. And, as the court explained, the child-abuse diagnoses offered in the case by the state were already admitted as scientific evidence.

"We review for errors of law the question 'whether a trial court properly applied OEC 702 to decide whether an expert is qualified to give testimony *relative to a particular topic*.'" *State v. Woodbury*, 289 Or App 109, 114, 408 P3d 267 (2017) (quoting *State v. Rogers*, 330 Or 282, 315, 4 P3d 1261 (2000) (emphasis in *Rogers*)). To be qualified as an expert on a particular topic, the person "must have the 'knowledge, skill, experience, training or education' to provide testimony 'in the form of an opinion or otherwise' regarding the 'particular topic' on which the person claims expertise." *State v. Althof*, 273 Or App 342, 345, 359 P3d 399 (2015), *rev den*, 358 Or 550 (2016) (quoting OEC 702). "The capacity to testify in every case is a relative one, *i.e.*, relative to the topic about which the person is asked to make his statement." *Id.* (internal quotation marks and brackets omitted).

We conclude that the trial court did not err in limiting Hyman from testifying about a child-abuse diagnosis for C. As the trial court recognized, the child-abuse diagnosis, as scientific testimony, was admitted at trial through the state's witness, who testified about her qualifications and the scientific process for making a child-abuse diagnosis. Hyman testified that he read child-abuse journals and rejected the criteria used to make child-abuse diagnoses and, indeed, rejected the entire child-abuse pediatric field as not based in science and being "very subjective." Based on that testimony, the trial court correctly determined that Hyman was not qualified to give a child-abuse diagnosis of C—he could not reliably apply the scientific principles as an expert to C's case because he entirely rejected them. *See Marcum v. Adventist Health System/West*, 345 Or 237, 248, 193 P3d 1 (2008) (admissibility of a particular diagnosis using a differential diagnosis methodology "will turn on whether the particular use of differential diagnosis to determine causation meets the more general test of scientific validity"). Hyman did not offer in his testimony a different

set of principles on which he was an expert and could apply to make a child-abuse diagnosis or how he applied those principles to C. *See Sanchez-Alfonso*, 352 Or at 804 (discussing what the expert must explain to establish a foundation for scientific testimony). Thus, the court correctly determined that Hyman was not qualified to give a child-abuse diagnosis. In addition, we reject defendant's suggestion on appeal that the trial court prevented Hyman from testifying about "the other side" of the scientific thinking on child abuse. In its ruling, the court expressly permitted Hyman to testify about his criticisms of the child-abuse pediatric field, and Hyman did voice some of those criticisms during trial.

Convictions on Counts 11 through 14 reversed; convictions on Counts 1, 2, and 7 reversed and remanded; remanded for resentencing; otherwise affirmed.